IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SUN COACH LINES, L.L.C., a )
Pennsylvania limited liability company, and )
PENNSYLVANIA TRANSIT SERVICES, )
INC., a Pennsylvania corporation, )
            Plaintiffs, )
  )
        vs. )      Civil Action No. 07-1044
  )
PORT AUTHORITY OF ALLEGHENY )
COUNTY, )
          Defendant. )

MEMORANDUM OPINION

HAY, Magistrate Judge

      Plaintiffs, Sun Coach Lines, L.L.C. and Pennsylvania Transit Services, Inc. bring, this

action against Defendant, Port Authority of Allegheny County (Port Authority), alleging that its

denial of their request for a licence to use the Martin Luther King, Jr. East Busway to transport

passengers into and out of downtown Pittsburgh violates their right to equal protection of the

laws under the Fourteenth Amendment to the United States Constitution.  Plaintiffs and

Defendant have filed cross-motions for summary judgment.  After careful consideration of the

motions, the memoranda of law in support and in opposition and the supporting materials

supplied by the parties, this Court will grant Defendant's motion and deny Plaintiffs' motion.

     Facts

      Plaintiff Sun Coach Lines, L.L.C. is a Pennsylvania limited liability company.  (Compl.

¶ 1.)[1]  Plaintiff Pennsylvania Transit Services, Inc. is a Pennsylvania corporation.  (Compl. ¶ 2.)

---

[1]Docket No. 1.

Defendant Port Authority is "a public bod[y] corporate and politic" created in 1959 under the Second Class County Port Authority Act, 55 P.S. §§ 551-563.5. 55 P.S. § 553(a). (Pls.' App. Ex. A; Ex. B at 2-3.)[2]

The Port Authority owns and operates three exclusive bus rights-of-way, known as busways, in Allegheny County. (Pls.' App. Ex. C at Doc. No. PAAC 0095; Pls.' App. Ex. D at Doc. Nos. PAAC 0125-0126.) One of these busways is known as the Martin Luther King, Jr. (East) Busway (the "East Busway"), which is a two-lane concrete roadway that travels between Wilkinsburg and downtown Pittsburgh. (Pls.' App. Ex. C at Doc. No. PAAC 0095; Pls.' App. Ex. D at Doc. No. PAAC 0126.)

Through December 2005, Plaintiffs operated a bus route from points outside Allegheny County into downtown Pittsburgh via the East Busway as a subcontractor for the Westmoreland County Transit Authority ("WCTA"). (Compl. ¶ 5; Answer ¶ 5[3].) Plaintiffs had been a subcontractor of the WCTA since approximately 2000. (Pls.' App. Ex. E.)

Plaintiffs state that, as a subcontractor to WCTA, they complied with all existing safety requirements and operational conditions required by the Port Authority for use of the East Busway. (Compl. ¶ 6; Answer ¶ 6.) Defendant counters that it did not monitor whether Plaintiffs complied with these conditions, but left that responsibility to WCTA.

Plaintiffs discontinued operations as a subcontractor to the WCTA in December 2005. (Compl. ¶ 7; Answer ¶ 7; Pls.' App. Ex. E.) Shortly thereafter, in December 2005, Plaintiffs, through their attorneys, contacted representatives of the Port Authority to discuss a license or

---

[2]Docket No. 27.

[3]Docket No. 10.

permission for Plaintiffs to use the East Busway to provide for transportation from points outside Allegheny County into downtown Pittsburgh and outbound via the East Busway. (Compl. ¶ 8; Answer ¶ 8; Pls.' App. Ex. F at Doc. No. PAAC 0703.)

At the time they initially contacted the Port Authority in December 2005 to "request[ ] a cost to use the East Busway for their private passenger transit business," Plaintiffs "retain[ed] the drivers and equipment certified to operate on the East Busway." (Pls.' App. Ex. F at Doc. No. PAAC 0703.)

In January 2006, William Buck, Plaintiffs' counsel, sent emails to Henry Nutbrown, an employee of the Port Authority, to determine the status of the Port Authority's review of Plaintiffs' request to operate and utilize the East Busway. (Pls.' App. Ex. G at Doc. Nos. PAAC 0667-0669.) On January 26, 2006, Nutbrown sent an email to Buck stating that "[i]n order to properly address [Plaintiffs'] request, [the Port Authority] will need to know [14 pieces of] information[.]" (Pls.' App. Ex. G at Doc. No. 0667; Compl. ¶¶ 10-11; Answer ¶¶ 10-11.)

On February 27, 2006, Lynda Conway, an employee of the Port Authority, submitted an interoffice memorandum regarding Plaintiffs' inquiry into "whether or not [Plaintiffs] would be able to continue to operate on the East Busway." (Pls.' App. Ex. H at Doc. Nos. PAAC 0648-0650.) Conway personally "d[id] not recommend permitting private carriers to operate on the [Port Authority's] busways for [several] reasons . . .." (Id. at Doc. No. PAAC 0648.) The memorandum did state, however, that the "Port Authority, in the late [19]70's and early [19]80's, did permit a private bus companies [sic] to operate only their commuter run on the South Busway." (Id. at Doc. No. 0649). The February 27, 2006 memorandum also stated that "[t]oday, private companies are only permitted to use the East Busway from Penn Station to 26th Street for

layovers/recoveries and only for their commuter service." (Id.)

The memo referenced a July 6, 2005 memorandum prepared by Michael Zamiska, Chairman of the Port Authority's Operations and Safety Review Committee, in which Zamiska indicated the "nearly unanimous" rejection of a proposal to allow private carriers to utilize the Port Authority's busways for a fee. (Def.'s App. Ex. I.)[4] Zamiska stated that the Pennsylvania Department of Transportation's State Oversight Committee had indicated in 2001 that a proposal to allow access for taxis and limousines on Port Authority busways "raise[d] significant safety issues." (Id.)

On March 24, 2006, Buck responded to Nutbrown's January 2006 request for additional information. (Pls.' App. Ex. I.) This March 24, 2006 email stated, in part, that

> [Plaintiffs] anticipate[ ] operating five buses during the morning commute and five buses during the afternoon commute each day of the week for public/private service with no layovers in downtown Pittsburgh or on the East Busway. [Plaintiffs] propose[ ] to enter the East Busway at the Wilkinsburg exchange. [Plaintiffs] use[ ] MCI-102 D3 buses (28,000 lbs. empty/42,000 lbs. loaded), which have a capacity for 49 passengers.
>
> [Plaintiffs] maintain[ ] certified, licensed drivers to carry passengers via the East Busway, as [they] did as a contractor [with WCTA], and [their] fleet remains compliant with all license and insurance requirements.

(Id.)

Approximately one month later, on April 24, 2006, Nutbrown responded to Buck's email with another set of questions for Plaintiffs to answer, this time numbering 12 separate items. (Pls.' App. Ex. J at Doc. Nos. PAAC 0662-0663.)

On May 18, 2006, Buck responded via email to Nutbrown's April 24, 2006 email

---

[4]Docket No. 23.

requesting the 12 additional pieces of information.  (Pls.' App. Ex. K at Doc. Nos. PAAC 0657-0658.)  Buck's email reminded Nutbrown that Plaintiffs "served as a contractor for a transit authority [i.e., the WCTA through December 2005] and as such was required to comply with these [same] requirements at that time."  (Id. at Doc. No. PAAC 0657.)  Defendant maintains that Plaintiffs' response contained incomplete information and/or otherwise indicated that the information would be provided at a later date.

In a June 13, 2006 letter to James Dodaro, Treasurer of the Port Authority, Plaintiffs' counsel stressed that Plaintiffs could not "move forward with any prospective operations without an understanding of the cost structure or license fee to be required by the Port Authority" for Plaintiffs' use of the East Busway.  (Pls.' App. Ex. L at Doc. Nos. PAAC 0671-0672.)

In March 2007, Plaintiffs' counsel contacted the Port Authority to determine the status of their request to use the East Busway.  (Pls.' App. Ex. M at Doc. No. PAAC 0647.)  Christopher Hess, Assistant General Manager of Legal & Corporate Services for the Port Authority, responded in a letter dated March 19, 2007 that the Port Authority "will consider the additional information to be submitted by [Plaintiffs] in evaluating its application," and that it "is currently attempting to address the costs and operational issues associated with such usage."  (Id.)

Plaintiffs again contacted the Port Authority on April 12, 2007.  Buck wrote as follows to Christopher Hess:

> In the interest of expediting the Port Authority's review of my clients request, I need to know what information is required concerning the number of anticipated runs, both in the morning and evening, as well as our position that no PUC certificate is required to operate these particular runs.  As we have indicated in prior correspondence, my clients anticipate five bus runs in the morning between 6:45 a.m. and 8:30 a.m. and five bus runs in the afternoon between 4:30 p.m. and 6:00 p.m.  The buses will not remain on the East Busway following completion of each particular trip.

If the Port Authority requires additional information or a more detailed response, then a representative of the Port Authority must respond to my inquiries. I assume the Port Authority does not anticipate that my clients will go out and conduct studies as to timing and route patterns without any indication that a license will be granted.

I understand the necessity of reviewing route plans and safety requirements when contemplating whether to grant a license to use the East Busway, however my clients have not received any information regarding the rate structure or license fee. My presumption is that the rate and license fee will be the same or similar to those already using the East Busway, regardless of the fact that it may be the most utilized route in the Port Authority's system, to eliminate any potential disparate treatment between providers.

My clients believe that the Port Authority's continued delay in responding to our inquiries, providing information on the license fee structure and the issuance of the license has caused considerable lost revenue to its operations.

(Pls.' App. Ex. N.)

On May 1, 2007, Buck wrote to Hess to state that:

To date, I have not received any response to my correspondence of April 12, 2007 related to my clients['] anticipated operations on the ... East Busway. The Port Authority continues to delay in considering my clients' request, while other operators utilize the East Busway. I have been instructed to file a complaint based upon this disparate treatment if we do not receive the approval for a license on or before May 4, 2007.

(Def.'s App. Ex. L.)

On May 2, 2007, the Port Authority requested that Plaintiffs provide nine items of

information in order for the Port Authority to respond to Plaintiff's April 12, 2007 request for

information regarding the "rate structure or license fee" applicable to Plaintiffs' request for a

license to use the East Busway. Hess wrote that:

These issues are extremely important and we cannot simply take [your] word for it that this "information will be provided" at some later date.... Contrary to your client's assertions, Port Authority cannot will not simply "indicate" that a license will be granted without this information being first provided, as is required of every firm seeking to offer service within Port Authority's system.

(Pls.' App. Ex. O.)

On July 25, 2007, Plaintiffs commenced this action against the Port Authority by filing a complaint alleging violations of the equal protection clause of the Fourteenth Amendment to the United States Constitution. On October 30, 2007, the Port Authority filed its Answer. On January 22, 2008, an Initial Scheduling Conference was held, following which a hearing memo was entered indicating that Plaintiffs would submit the information Defendant requested by February 21, 2008 (Docket No. 13). Plaintiffs' counsel requested additional time and was given until February 28, 2008 (Docket No. 16).

On February 28, 2008, Plaintiffs' counsel submitted a letter to the Port Authority, providing responses to the 12 questions that the Port Authority had posed to reach a final decision on Plaintiffs' request for a license or permission to use the East Busway. (Pls.' App. Ex. P.) Port Authority personnel, including Christopher Hess, Scott Vetere (Director of Service Planning & Scheduling–Conway's successor upon her retirement in 2007), Charles Rompala (Assistant Manager of Road Operations), and Port Authority's counsel, met on March 18, 2008 to evaluate these responses. (Hess Aff. ¶ 5.)[5]

Hess indicates that they found several of the responses incomplete and/or otherwise indicated that they were "tentative" and "subject to change." (Hess. Aff. ¶ 7.) Specifically, he states as follows:

> (1) Plaintiffs did not provide specific trip times, in either the a.m. or p.m., for their planned entrance onto/exit from the East Busway at the Wilkinsburg Station or Penn Station. Rather, Plaintiffs continued to merely provide "windows" of time in which Plaintiffs intended to have five runs on the East Busway (6:30-8:30 a.m.

_____

[5]Def.'s App. Ex P.

and 4:30-5:30 p.m.). Port Authority requested and required specific trip times from Plaintiffs because of the operational and safety concerns relating to traffic on the East Busway, particularly during the morning and afternoon rush periods that Plaintiffs indicated they wanted to travel on the East Busway. During these times, bus and pedestrian traffic is particularly high, meaning Port Authority needs specific trip times to determine whether proposed access would interfere with existing bus operations/pedestrian safety. Furthermore, even the "windows" provided by Plaintiffs were not finalized, in that Plaintiffs indicated in their response that "exact times and routes will be established upon approval by the Port Authority ... and are subject to change."

(2) Plaintiffs did not provide exact routing and/or stops for their proposed use, but rather listed a few "tentative" stops, noting that "an assessment will be completed upon approval" of the license and will be "subject to change based on ridership." Of the few stops listed, several were facially incomplete. For instance, Plaintiffs indicated that they will enter the Wilkinsburg Terminal from Route 30, but failed to indicate where exactly they would enter, which is important considering there are three (3) different ways to enter the Wilkinsburg Terminal in Wilkinsburg after exiting Route 30. Also, Plaintiffs identified two (2) downtown Pittsburgh stops that were clearly listed without any real planning or contact with the appropriate authorities. Plaintiffs identified a stop "at Liberty Avenue in the vicinity of the Federal Building," a location where buses are prohibited from stopping due to security measures at the Federal Building. Plaintiffs also identified a stop at "Forbes and Grant," which is impossible as the City of Pittsburgh removed all buses from Forbes Avenue in May of 2008. As with the specific trip times, Port Authority personnel require exact routing to assess the operational and safety issues related to increased bus traffic. Another concern is Plaintiffs did not provide for any recovery/layover area for their drivers, which is important for staging of buses and driver breaks/safety.

(3) Plaintiffs still did not provide any sort of fare structure, but merely indicated it would be "based, in part, on the license fee required for use of the East Busway."

(4) In response to Port Authority asking if PUC approval was required for Plaintiffs' proposed operation, Plaintiffs merely stated PUC approval was not required because they were purportedly providing an interstate service. Plaintiffs did not provide any legal support (statutory or otherwise) for this bald assertion.

(5) In response to Port Authority's request to detail the operator training program, Plaintiffs merely indicated it would be the same as when Plaintiffs were a sub-contractor for WCTA and also indicated that Port Authority would hold classes. Because Plaintiffs' prior use of the East Busway was solely as a sub-contractor for the WCTA, it was WCTA's responsibility at that time to ensure that Plaintiffs had a compliant program. Now that Plaintiffs would like their own, independent use

of the East Busway, Port Authority directly requires specific, detailed information regarding the operator training program that Plaintiffs have in place to ensure it is acceptable to Port Authority.

(Hess Aff. ¶ 8.)  Plaintiffs note that these supposed deficiencies were never communicated to them.

Hess further states that the Port Authority found unexplained discrepancies between Plaintiffs' original May 18, 2006 responses and their February 28, 2008 responses.  (Hess Aff. ¶ 10.)  Specifically, he states that:

> (1) In response to the question of whether the service being provided was public or private, Plaintiffs originally indicated that the service was "private/chartered." In its new responses, Plaintiffs changed this answer to indicate that the service was "public" in nature.  This distinction is important because of its potential impact on Port Authority's existing service and because Port Authority personnel believe that there are potential issues relating to whether Plaintiffs can even operate a competing public transit service for residents of Westmoreland County without the explicit permission of the WCTA and/or the PUC.  This type of approval from Port Authority would be required pursuant to the Second Class County Port Authority Act for any private entity that would attempt to run public bus service for residents of Allegheny County.
>
> (2) Plaintiffs originally indicated that the planned service was "chartered," but then changed their answer to "fixed route."  This distinction is important for the same reasons stated above for the "private/chartered" versus "public" distinction.
>
> (3) In their original responses, Plaintiffs did not indicate anything about the service being interstate in nature.  In their new responses, Plaintiffs state that "the planned routes are part of a regular interstate service ending in Wheeling, WV. Port Authority personnel fail to understand why the other information pertaining to stops indicates that Plaintiffs intend to "loop" around Downtown.  If Plaintiffs intend to travel to Wheeling, West Virginia, it would seem traveling through Wilkinsburg and on downtown Pittsburgh streets is unreasonable considering the Parkways East and West would provide a faster route for doing so.

(Hess Aff. ¶ 11.)  Hess states that these discrepancies "indicated a lack of planning and effort that went into Plaintiffs' request, a disturbing sign for me and other Port Authority personnel." (Hess Aff. ¶ 12.)  Plaintiffs again note that the Port Authority never communicated these supposed

discrepancies to them.

Hess states that:

> Based upon the continued incompleteness of Plaintiffs' responses, along with the unexplained discrepancies/differences between the original and new responses, I consulted with Mr. Vetere, Mr. Rompala and Port Authority's counsel, and made the decision to deny Plaintiffs' request.

> I instructed Port Authority's counsel to communicate Port Authority's denial to Plaintiffs' counsel.

(Hess Aff. ¶¶ 13-14.)

On March 27, 2008, the Port Authority officially denied Plaintiffs' request for a license to use the East Busway. The letter stated that, "[b]ased on the information that has been provided to date, Port Authority is denying your request for a license to use the East Busway at this time." (Pls.' App. Ex. Q.) The letter does not indicate the reason for the decision.

Procedural History

Plaintiffs filed this action on July 25, 2007. The complaint alleges that Defendant violated Plaintiffs' right to equal protection of the laws, as protected by the Fourteenth Amendment to the Constitution, by denying its request for a license to use the East Busway when it granted licenses to similarly situated applicants. It is brought pursuant to 42 U.S.C. § 1983.

On September 5, 2008, cross-motions for summary judgment were filed by Plaintiffs and Defendant.

Standard for Summary Judgment

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130.

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

    Section 1983 of the Civil Rights Act

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Thus, to establish a claim under this statute, "a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under color of state law." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc).

The Fourteenth Amendment provides that states shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. Equal protection "directs that 'all persons similarly circumstanced shall be treated alike.'" Plyer v. Doe, 457 U.S. 202, 216 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)). "This provision creates no substantive rights." Vacco v. Quill, 521 U.S. 793, 799 (1997) (citation omitted). Only when a state "adopts a rule that has a special impact on less than all persons subject to its jurisdiction" does a question arise as to whether the Equal Protection Clause is violated." Alexander v. Whitman, 114 F.3d 1392, 1406 (3d Cir. 1997) (quoting New York City Transit Auth. v. Beazer, 440 U.S. 568, 587-88 (1979)).

If government action "neither burdens a fundamental right nor targets a suspect class, we will uphold the ... classification so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996). The action "is presumed to be valid and will be sustained if the classification drawn by the [action] is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness or logic'" of government activity. Heller v. Doe, 509 U.S. 312, 319 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993)).

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.'" Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (quoting Kuhar v. Greensburg-Salem Sch. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980)). See also Phillips v. County

of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008); Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006) ("a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.") As discussed below, Plaintiffs contend that they are similarly situated to Myers Bus Company and that the Port Authority had no rational basis for its decision to delay and deny their application for a license.

In the Hill case, a Borough Manager (Hill) brought suit after the mayor of the Borough (Marino) defamed and harassed him and other employees in retaliation for his reporting of Marino's harassment and for positions that Hill took that were contrary to Marino's, culminating in the workplace becoming so intolerable that Hill had no choice but to resign. He alleged that Marino's campaign of harassment, defamation and retaliation violated his right to, inter alia, equal protection. The Court of Appeals affirmed the dismissal of this claim on the ground that Hill did not allege the existence of similarly situated individuals, that is, borough managers whom Marino treated differently. In fact, the court noted that the only other borough employees Hill mentioned in his complaint were also harassed and threatened by Marino. 455 F.3d at 239.

Defendant cites Holt Cargo Systems, Inc. v. Delaware River Port Authority, 20 F. Supp. 2d 803 (E.D. Pa. 1998), aff'd, 165 F.3d 242 (3d Cir. 1999).[6] In that case, Holt Cargo, a stevedoring company operating in the Philadelphia and Camden Port District (Port District), and other plaintiffs, alleged that the Delaware River Port Authority (DRPA), the Port of Philadelphia

---

[6]Although the Court of Appeals published a decision on the appeal, the court merely stated that "the injuries alleged to have been suffered by Holt do not stem from a constitutional violation. We will therefore affirm ... substantially for the reasons stated in the thorough opinion of the District Court." 165 F.3d at 244.

& Camden, Inc. (PPC) and the Philadelphia Regional Port Authority (PRPA), conspired with others, under the guise of unifying the Port District, to deprive them of their property interests and deny them equal protection of the laws. "Plaintiffs' allegation of intentionally discriminatory actions to injure their business by offering more generous lease terms to others similarly situated survived a motion to dismiss." Id. at 818.

However, when motions for summary judgment were filed by the defendants, the court granted them. First, it held that the other entities to which the plaintiffs compared themselves were similarly situated, because "they all engage in port-related business of one kind or another" and "any two entities will look sufficiently dissimilar if examined at a microscopic level." Id. at 826. However, the court recognized that "there is a fundamental difference between public agencies and private companies," so that DRPA's denial of a loan to Holt's tenant at the same time that it lent $2,500,000 to a public entity was not comparable as a matter of law. Id. See also Croman v. City of Kansas City, Mo., 29 F. Supp. 2d 587, 590-91 (W.D. Mos. 1997) (finding that ordinance distinguishing between amplifying music on public versus private property did not violate Equal Protection Clause), aff'd mem., 168 F.3d 492 (8th Cir. 1998).

With respect to the issue of different treatment, the court held that a governmental agency offer of different leases or contract terms to different entities for different pieces of property is not discriminatory treatment under the Equal Protection Clause, and if anything, Holt Cargo received more favorable terms in its lease than did the competitors it cited. Id. at 827. Finally, with respect to the issue of rational basis, the court concluded that PRPA's offer of different lease terms to various companies for separate and distinct parcels of land with different facilities, equipment and access to the intermodal yard and the mouth of the port was not irrational, and an

14

interest in maximizing revenues or encouraging the development of competing private enterprises is a legitimate and rational purpose, and the same analysis applied to DRPA's acts of approving a smaller loan to a competitor but denying Holt's tenant's request for a loan for ten times as much money. Id. at 828.

Different Treatment of Similarly Situated Entities

Besides the Port Authority, the only other transit-related entity that has permission to use the entire span of the East Busway for transporting passengers in and out of downtown Pittsburgh is the WCTA. (Conway Memo at 3; Hess Aff. ¶ 15.) Defendant states that, similar to the Port Authority, the WCTA is a government agency organized to provide public transportation services to residents of Westmoreland County, Pennsylvania and it receives various federal, state and local funds, a portion of which is allocated to Port Authority for allowing the WCTA to use the East Busway. (Hess Aff. ¶ 16; Conway Memo at 3; Def.'s App. Ex. B.) However, as noted above, the WCTA is a public agency and Plaintiffs are private entities and "there is a fundamental difference between public agencies and private companies" such that the WCTA cannot be considered substantially similar to Plaintiffs. They do not contend otherwise.

In addition the WCTA, four other government agencies providing public transportation services–the New Castle Transportation Authority, the Washington County Transportation Authority, the Beaver County Transit Authority and the Mid-Mon Valley Transit Authority–use the East Busway. However, these are also public agencies that cannot be considered substantially similar to Plaintiffs. In addition, Defendant notes that these entities only travel a small portion of the East Busway for recovery at Penn Station, and none of them are permitted to travel past the 26th Street ramp. (Conway Memo at 3; Hess Aff. ¶ 18.) These recovery/layover

periods are purely for the drivers to take a break and/or wait for their next scheduled trip into downtown Pittsburgh, and there are no passengers aboard the buses during these periods. (Hess Aff. ¶¶ 19-20.)

Plaintiffs contend that Myers Bus Company (Myers) is a private, non-public transit agency that the Port Authority currently permits to use the East Busway. (Pls.' App. Ex. H at Doc. No. 0650.) Defendant responds that Myers's use of the East Busway is limited to recovery/layover at Penn Station for its Butler-to-Pittsburgh commuter route that the Port Authority did not purchase when it was organizing in the late 1960s. It states that the total distance traveled by Myers is approximately 300 yards of the 9.1 mile-long East Busway and that Myers is not permitted to transport or board any passengers on its buses during the recover or layover periods on the East Busway. (Conway Memo. at 3; Hess Aff. ¶ 21.) Plaintiffs deny that Myers's use makes a material difference from their proposed use.[7]

Lastly, there are a limited number of permits issued to non-Port Authority vehicles to use the entire span of the East Busway, primarily for police, fire and emergency medical vehicles. (Conway Memo at 3; Hess Aff. ¶ 22.) Hess states that all of these entities provided all information requested by Port Authority prior to their respective uses being approved. (Hess Aff. ¶ 23.) Plaintiffs respond that the Port Authority has failed to attach any documents showing that this is true.

Hess states that he is unaware of any private transit authorities currently using the East Busway in the manner that Plaintiffs have requested and that, although some private, non-

---

[7]They further note that the Port Authority's Busway Manual (Pls.' App. Ex. D at Doc. No. PAAC 0126) states that the East Busway is 6.8 miles in length, not 9.1 miles. This observation constitutes a disputed issue of fact, but not a material one.

governmental transit agencies used the busways several decades ago, the Port Authority has

barred private carriers from using its busways and rights-of-way for transit services. (Hess Aff.

¶¶ 24-25.) Plaintiffs observe that both the Hess Affidavit and the Conway Memorandum identify

Myers as a private carrier using the Port Authority's East Busway in connection with its

provision of transit services. (Hess Aff. ¶ 21; Pl. App. Ex. H at Doc. No. PAAC 0650.)

As noted above, in July 2005, the Port Authority's Operations and Safety Review

Committee rejected a proposal to open the Port Authority busways to private carriers. (Def.'s

App. Ex. I.) Defendant also notes that it rejected a formal request by Fullington Trailways

(Fullington), a private carrier, to use the East Busway (and West Busway) in 2007. Plaintiffs

observe that this request was significantly different from theirs because Fullington intended to

use both the East and West Busways for "routes serving Downtown Pittsburgh and the Pittsburgh

International Airport ... during weekends when the Parkway East is closed for construction."

(Def.'s App. Ex. R at Doc. Nos. PAAC 0775-0776.)

Plaintiffs note that their proposed use was for only the East Busway between

Westmoreland County and points east, and downtown Pittsburgh. (Pls.' App. Ex. I.) They argue

that, given these differences between their request and Fullington's request, Fullington is not

"similarly situated" to them, as the Port Authority alleges. They further note that the Port

Authority's July 18, 2007 letter, which was communicated to Fullington less than a month after

its initial June 21, 2007 request for use, recommended two alternate "courses of action" that

could result in Fullington being able to use the East Busway in the future. (Def.'s App. Ex. R at

Doc. Nos. PAAC 0775-0776.) On the other hand, Plaintiffs contend that, after taking several

months to respond to their initial request for the costs associated with using the East Busway,

that the Port Authority devised several rounds of questions, none of which were requested of Fullington, and at no time did the Port Authority communicate to Plaintiffs alternate means by which Plaintiffs could obtain access to the East Busway.

In this case, Plaintiffs point to Myers as a substantially similar entity, but Defendant contends that Myers is not substantially similar because its use of the East Busway (limited to recovery/layover at Penn Station, with no passengers onboard and utilizing only 300 yards of the approximately 9.1-mile busway) differs from Plaintiffs' proposed use of the entire busway, including boarding passengers. Defendant is examining the issue at a "microscopic level." For purposes of this case, Myers constitutes a substantially similar entity, namely a private carrier that requested permission to make some use of the East Busway.

However, this analysis also leads to the conclusion that Fullington is a substantially similar entity. Plaintiffs cannot have it both ways: either private carriers who propose to utilize the Port Authority's busways are similarly situated to them (in which case both Myers and Fullington are comparators) or they are not because their proposed use of the busways differs (in which case neither Myers nor Fullington can be a comparator and Plaintiffs cannot maintain their cause of action). Although it is a close question, under the reasoning of the Holt Cargo case, the Court concludes that both Myers and Fullington constitute substantially similar entities.

Nevertheless, Myers' use of the East Busway is different enough from Plaintiffs' proposed use such that the Court can determine that Plaintiffs were not treated in a materially different manner. As in Holt Cargo, the governmental agency is treating different agencies differently based on their different proposed courses of action. This does not constitute discriminatory treatment under the Equal Protection Clause.

18

As for Fullington, it received the <u>same</u> treatment that Plaintiffs did–denial of a request for a license–even if its proposed use differed in some respects from Plaintiffs' proposed use. Plaintiffs offer no support for their argument that Fullington received "better" treatment than they did because Fullington's application was rejected more quickly. Moreover, the fact that Plaintiffs' proposed use of the East Busway differed from that proposed by Fullington does not support Plaintiffs' contention that their application should have been granted.

<u>Rational Basis</u>

Even if Plaintiffs established that they were treated in a materially different manner from Myers (and ignoring the fact that Fullington's request was also denied), they must still show that Defendant acted irrationally in denying their application for a license to use the East Busway. Defendant states that it denied Plaintiffs' request because of their continued failure to provide full and complete responses to the information requested. Plaintiffs contend that they did provide the information requested, but they do not dispute the five deficiencies and three discrepancies identified by Christopher Hess. As Hess explains, Plaintiffs' incomplete and inconsistent answers to the questions raised serious issues of safety, operations and costs for the Port Authority. Failure to answer important questions posed by a governmental agency constitutes a rational basis for the agency's decision to deny a plaintiff's request. <u>See</u> <u>Muller Tours, Inc. v. Vanderhoef</u>, 13 F. Supp. 2d 501, 506-08 (S.D.N.Y. 1998) (county had a rational basis for its refusal to apply for certain funds on behalf of plaintiff commuter bus company even though it applied for funds for other companies, in that plaintiff's application contained many deficiencies and raised issues about providing duplicative services).

As noted above, rational-basis review in equal protection analysis is not an occasion for

courts to judge the wisdom, fairness or logic of government activity. <u>Heller</u>, 509 U.S. at 319. Thus, the task before the Court is not to evaluate whether the Port Authority's decision to ask the questions it did was wise, fair or logical, or whether it should have granted Plaintiffs' request for a license despite their incomplete and inconsistent answers to these questions. Nor is the question before the Court whether, having allowed Myers to make a limited use of a small section of the East Busway, the Port Authority should have allowed Plaintiffs to utilize the entire East Busway in the manner they proposed. Plaintiffs have failed to demonstrate that Defendant lacked a rational basis for its decision.

Based on the foregoing, the motion for summary judgment filed by Defendant Port Authority of Allegheny County shall be granted and the motion for summary judgment filed by Plaintiffs Sun Coach Lines, L.L.C. and Pennsylvania Transit Services, Inc. shall be denied. An appropriate order will follow.

/s/ *Amy Reynolds Hay*
United States Magistrate Judge

Dated: 11 May, 2009

cc: All counsel of record by Notice of Electronic Filing